Irving H. Saypol, J.
These are two proceedings in which five petitioners personally and representatively ask for orders under article 78 of the Civil Practice Act compelling the respondent to perform its duties specifically enjoined by law.
The uncontroverted allegations in the petitions show that Ayman and Johnson are teachers in the Board of Education of the City of New York and thereby are members of the Teachers’ Retirement Association of the Teachers’ Retirement System, which is administered by the respondent. Johnson’s work began on September 7, 1917; the date of Ayman’s employment is not shown. Straus, Young and Greenwood are former teachers and members of the Teachers’ Retirement Association, who were working as teachers before July 1, 1940, and then retired at different times after September 22, 1950. They are recipients of retirement allowances from the Retirement System. These allowances were fixed by the respondent at the times of their retirements. The respondent is a corporate body charged by law with the administration of the Teachers’ Retirement System.
Reading both petitions together, it is alleged in either or both that pursuant to the New York City Teachers’ Retirement Law (which is Administrative Code of City of New York, ch. 20, tit. B, §§ B20-1.0-B20-51.0; hereafter referred to by section reference alone), a retirement system is established for public school teachers in New York City, which provides various benefits, including an annuity upon retirement, derived from their regularly-deducted payroll contributions. Section B20-13.0 provides for the method of determining the rates of such contributions for new entrants. These rates shall be calculated according to actuarial values based upon service and mortality tables of experience of members and beneficiaries, adopted by the respondent upon its quinquennial actuarial investigations of the operations of the system. Section B20-44.0 provides that a contributor, upon retirement, shall receive a retirement allowance, including an annuity which shall be the actuarial equivalent of his accumulated deductions at the time of his retirement. Existing actuarial tables were in use before July 1, 1940, which was the effective date of section 7 of article V of the New York State Constitution (adopted by the People at the general election in Nov., 1938). It is declared by this constitutional provision that, after its effective date, membership in a pension or retirement system of this State or a civil division shall be a contractual relationship the benefits of which shall not be diminished or impaired.
On June 22, 1943 respondent adopted new tables, including mortality experience tables, to take effect September 1, 1944. *358 It is charged that the use of the later mortality experience tables when determining the annuities of these petitioners is illegal and invalid. In other words, because of the constitutionally declared contractual relationship, all persons in service on its effective date, July 1,1940, were entitled, upon retirement thereafter, to calculation of the annuity portion of their retirement benefits according to the tables in effect on July 1, 1940. The later tables which became effective on September 1,1944, reflecting, as they do, lower rates of mortality and consequently longer anticipated future life spans over which the aggregate of a member’s contributions must be spread, cause a reduction in the amount of each installment of the annuity during the life of the beneficiary. It is charged that the reduction is between 6% to 9% in monthly or annual payments, therefore violating the constitutional proscription against diminution or impairment of the benefits of declared contract. Substantially, the relief which is demanded, having been refused by the respondent, is a direction that the 1944 actuarial tables are inapplicable when determining annuities of all, like the petitioners, who were in service before the effective date of the new mortality experience tables, September 1, 1944; a direction requiring the use of the actuarial tables which were in effect on July 1, 1940, when computing annuities of those who entered service before September 1, 1944; and a direction for the payment of the amounts withheld from the annuity payments of retired members who were working before September 1, 1944 and thereafter retired with annuities determined by the respondent according to the later actuarial tables.
The Attorney-Q-eneral of the State of New York has intervened, with leave of the court, and has been heard on his brief, in which he argues in support of the petitioners.
The respondent, by answers and affidavits, raises no material issue of fact. The petitions are attacked as insufficient in law, before and after answer. In addition to the formal denials, four affirmative defenses are pleaded: in substance, that the respondents have acted properly, because the use of later tables when determining retirement annuity benefits is pursuant to statutory provisions pre-existing the constitutional amendment and thereby unaffected; that the respondent’s course of conduct has been participated in and accepted by the petitioners, or some of them; that the petitioners, having delayed for 15 years since the effective date of the new tables, are chargeable with laches; that those who remain employed and have not yet retired have no standing as suitors because their retirement allowances will not be calculated before they do retire and *359 because there is no determination or action to be reviewed, their rights are inchoate; there is no provision in law to satisfy the-tremendous obligation of $36,608,000 which will be imposed on the Betirement Fund and the City of New York if there be a ruling adverse to the respondent. This amount would be needed to pay an estimated $2,795,000, representing accrued but withheld annuities and $3,813,000 to establish reserves for the increased future annuity requirements of 4,300 retired beneficiaries and the balance of $33,000,000 to provide reserves for the 22,000 members who have not yet retired. That presents the dire threat of impending bankruptcy of the System. (Its assets according to its 1957 report are $823,718,888.79.) Timely judicial action 15 years age would have enabled funding by annual, actuarially computed payments by the city for an aggregate sum of $33,700,000, which includes $5,000,000 in earned interest on those payments.
The four-month time limitation of section 1286 of the Civil Practice Act is pleaded as to all the petitioners, and the six-year time limitation of section 48 of the Civil Practice Act is pleaded as to the petitioner Young, who, as shown, retired on September 22, 1950.
Considerable historical background is depicted in the affidavit and reply affidavit of the acting actuary of the System, who has been connected with it in related "capacities since 1924, in support of the affirmative defense — i.e., that there is no provision in the law to satisfy this unforeseen deficit in the event of an adverse ruling. In its brief on this point, the respondent argues: “ The conclusion that the retirement statute requires computation of the annuity benefit at retirement upon the basis of the latest revised mortality table then in use is also demonstrated by the financial structure of the annuity benefit. As heretofore noted, there is no provision whatsoever in the statute for contributions by the City to the Annuity Reserve Fund (i.e., the fund from which the annuity granted to a member on retirement is payable throughout his life expectancy). Under the terms of the statute, this fund is composed entirely of the amounts of members’ accumulated deductions transferred from their annuity savings fund account at the time of retirement. Since there is no provision for augmenting the fund, the amount in the fund (i.e., the accumulated deductions of the member), must be spread as accurately as possible over the expected life span of the member. If an obsolete mortality table is used in determining this expected life span and if such table should show a lower [sic — obviously it should read ‘ higher ’] rate of mortality than the latest recorded experience demonstrates, the *360 amount of the accumulated deductions will be exhausted before the accurate life span has been completed. The result will be substantial deficit in the annuity reserve fund, without cmy corresponding provision in the statute for continual replenishment of such deficit on an actuarially determined annual basis .” This argument, ad hominem, is irrelevant and specious, rejected by respected judicial precedent, as will be discussed, infra, and is contradicted -by the provisions of section B20-30.0. It does seem to clash with the affirmative defense and the contentions in the supplemental affidavit of the acting actuary of the System that prompt action 15 years ago would have allowed satisfaction of a foreseeable deficit, by funding with city funds which would have prevented this impending obligation. It would seem that if there exists the power or obligation, or both, to meet and satisfy the current obligations of the System, it is the duty, too, of the respondent to obtain appropriations from the city to meet annual deficits in any of the funds under its supervision. If, in disregard of the law, the respondent overlooked or neglected its due performance at any time., it may not be excused in disregard of the rights of the petitioners.
The applications of the petitioners must be granted in all respects on the law, and the defenses in law and the affirmative defenses must be dismissed.
At the outset, it is appropriate to examine the following pertinent excerpts from the New York City Teachers’ Retirement Law.
Section B20-13.0:
“Retirement board; adoption of tables and certification of rates.— Every five years, the actuary of the retirement board shall make an actuarial investigation into the mortality and service experience of the contributors and beneficiaries as defined in this title, and shall make a valuation of the various funds provided for by this title, and on the basis of such investigation and valuation such board shall:
1. Adopt for the retirement system such mortality, service and other tables as shall be deemed necessary;
2. Certify the rates of deduction from salary necessary to pay the annuities authorized under the provisions of this title; and
3. Certify the rates of contribution, expressed as a percentage of salary of new entrants at various ages, which shall be made by the city to the contingent reserve fund.”

Section B20-20.0, subd. 2:

“ Contributions of members and their use; annuity savings fund.— The annuity savings fund shall consist of the accumu *361 lated deductions from the salaries of contributors made, under such rules and regulations as the retirement board shall prescribe, as follows:
# • #
2. From the salary of each new-entrant there shall be deducted such per cent of his earnable salary as shall be computed to be sufficient, with regular interest, to procure for him on service retirement an annuity equal to twenty-five per cent of his average salary. The rate per cent of such deduction from salary shall be based on the mortality and other tables herein authorized, together with regular interest, and shall be computed to remain constant during his prospective teacher-service prior to eligibility for service retirement.”

Section B20-30.0:

“ Guarantee of funds. — Regular interest, charges payable, the creation and maintenance of reserves in the contingent reserve fund and the maintenance of annuity reserves and pension reserves as provided for in this title and the payment of all pensions, annuities, retirement allowances, refunds, death benefits, and any other benefits granted under the provisions of this title, are hereby made obligations of the city. All income, interest, and dividends derived from deposits and investments authorized by this title shall be used for the payment of such obligations of the city. Upon the basis of each actuarial determination and appraisal provided for in this title, the retirement board pursuant to section one hundred fourteen of the charter shall prepare and submit to the director of the budget an itemised estimate of the amounts necessary to be appropriated by the city to the various funds to complete the payment of such obligations accruing durmg the ensuing fiscal year. The board of estimate shall include annually in the budget a sum sufficient to provide for such obligations of the city. The comptroller shall pay the sums so provided into the various funds provided for by this title.” (Emphasis supplied.)
Section B20-44.0, in part, as pertinent reads:
“ Retirement allowances. — A contributor, on retirement, shall receive a retirement allowance which shall consist of:
1. A pension calculated as follows:
* * *
b. For service retirement, or for disability retirement after he becomes eligible for service retirement, twenty-five per cent of his average salary. [Emphasis supplied.]
*362 2. An annuity, in addition to the pension, which shall be the actuarial equivalent of his accumulated deductions at the time of his retirement.” (Emphasis supplied.)
Birnbaum v. New York State Teachers Retirement System (5 N Y 2d 1) involved the same question under the New York State Teachers Retirement System (Education Law, art. 11). The appeal was from an order in a declaratory action granting judgment on the pleadings with a declaration for the defendant. The Corporation Counsel of the City of New York, who appears for the respondent here, appeared and filed a brief amicus curiae. The interest of the city, practically in paraphrase of its defenses here, is stated as follows in the Corporation Counsel’s brief (p. 2): “ The City of New York has a vital interest in the issue raised in this proceeding because it maintains several actuarial retirement systems which are generally similar to the State Teachers Retirement System. On March 25, 1958, this Court granted the City of New York permission to file a brief amicus curiae in support of affirmance.”
The Corporation Counsel then concluded (p. 12): “ The principle that retirement systems have the right to revise the mortality tables and make them applicable to existing members, pursuant to express statutory authority in existence at the time such members commenced membership, without infringing Constitution, Article 5, Section 7, is essential to the actuarial and financial soundness of such systems. If this principle were to be upset by this Court, the effect would be to mandate upon the City of New York, as well as other communities, huge and unforeseeable expenditures in connection with their maintenance and operation of retirement systems — the very evil which an actuarial system is designed to avert. (Hennessey v. Moore, 273 App. Div. 177 [3rd Dept., 1948].) ”
Digressing for the moment, it is difficult to follow the argument in the last sentence of the quoted conclusion from the brief of the Corporation Counsel in the Court of Appeals. It was shown to the Court of Appeals and it is stated here in the briefs of various of the parties that when the subject was considered by the Board of Estimate in connection with other pension systems in the City of New York, on the basis of an opinion of the Corporation Counsel in 1945, which, in substance, advised that the procedure was elective with the city fathers, the city utilized mortality tables pursuant to which rates of contributions had been established upon entering service rather than later statistics prevailing at the time of retirement. The latter practice is followed by the System for administrative employees *363 of the Board of Education of the City of New York (Education Law, § 2575, administered by the Board of Education of the City of New York according to its Bules and Begulations of the Board of Education Betirement System). There is not the slightest hint that this System or any other New York City or New York State system has been bankrupted or financially embarrassed thereby.
The Court of Appeals agreed with Special Term’s rejection of the defense that a member not yet retired lacked standing to sue, adopting and quoting the language from the opinion of Ringbose, J. (4 Misc 2d 356, 359) at page 6 (5 N Y 2d), as follows: “‘Neither of the plaintiffs has resigned or applied for retirement. Also recognized, is the possibility as urged by the defendant, that one or both of the plaintiffs may cease their employment as teachers in the public schools prior to attaining retirement status, in which event they could withdraw their accumulated contributions to the pension system and mortality tables in effect would have no bearing. However, the security offered by membership in the retirement system is generally regarded as an inducement to employment in State service or in the public schools. The value of retirement benefits and prospective rate of payment, especially in the face of continued inflation, is of vital concern to the plaintiffs and might well be the determining factor in their decision to continue in the teaching profession, or seek more lucrative employment.’ ”
Beading the Birnbaum majority opinion {supra) per Chief Judge Conway, after interpolation of similar if not identically worded Administrative Code section provisions by citation reference from the New York City Teachers’ Betirement Law, affords a convenient understanding and consideration of the problem and its answer (5 N Y 2d 1, 6, 7, 8):
“ Under the Teachers Betirement System [New York City Teachers’ Betirement System] a ‘ retirement allowance ’ is made up of two separate and independent parts: (1) a ‘ pension ’ which is provided from contributions made by the employer [City], and (2) an ‘ annuity ’ which is provided from contributions made by the member (Education Law, § 501, subds. 12, 13, 14). [Administrative Code, § B20-1.0, subds. 24, 23, 14.]
‘ ‘ The ‘ pension ’ part of the ‘ retirement allowance ’ is not involved in this case. Mortality tables are not involved in the computation of the ‘ pension ’ paid on superannuation retirement because the ‘ pension ’ consists of: ‘ One quarter (%) of his [the member’s] final average salary * * * (Education Law, § 510, subd. 2, par. b). [Administrative Code, § B20-44.0, subd. 1, par. b; see, also, subd. 1, par. d, but mortalitv tables *364 are involved in the certification of the rate of contribution by the city for a new-entrant to provide the ultimate % salary pension. § B20-13.0, subd. 3.]
‘1 The computation of the ‘ annuity ’ part of the ‘ retirement allowance ’ does involve the use of mortality tables. The Education Law (§ 510, subd. 2, par. a) [Administrative Code, § B2044.0, subd. 2] provides that the 1 annuity * * * shall be the actuarial equivalent of his accumulated contributions at the time of his [the member’s] retirement ’.
“ The term 1 actuarial equivalent ’ has reference to the mathematical formula for computing annuity payments according to the mortality table calculated and adopted pursuant to the provisions of subdivisions 4 and 5 of section 508 of the Education Law. [Administrative Code, § B20-13.0.]
“ The issue in this case relates solely to the use of new mortality tables to compute the ‘ annuity ’ which is payable upon retirement from funds contributed by the member. When the Teachers Retirement System [New York City Teachers’ Retirement System] adopted new mortality tables in 1946 [1944], the new tables were made applicable to the computation of all annuities of all members who had not previously retired. The new tables, as mentioned earlier, have the effect of reducing the annuities of all members of the system by approximately 5% [6% to 9.6%].
“As a practical matter, the controversy here comes to this: Plaintiffs argue that the contractual arrangement which the Constitution envisaged was the usual annuity policy whereby an insurance company, on the day the policy is issued, agrees that it will pay periodically a fixed and stated amount commencing on a certain date and that, viewed in that light, it was intended that a teacher who was a member of the Retirement System on July 1,1940, after making the required contributions to the Retirement System over the required period of time, should receive an annuity computed from mortality tables in use on July 1, 1940 (the date the constitutional amendment became effective). The defendant Retirement System, on the other hand, maintains that it was intended that the Retirement System should determine, at the time of retirement, the amount of annuity which the member’s contributions will purchase at the time of retirement, employing the mortality table in effect at the time of making such calculation.”
The Court of Appeals quoted from Matter of Day v. Mruk (307 N. Y. 349, 354, which overruled the contrary dictum in Roddy v. Valentine, 268 N. Y. 228) for its holding that the constitutional amendment (art. V, § 7) fixed the rights of the employee in a pension system as contractual with vested interests *365 as of the time he commences his employment and thereby becomes a member of the system. The court held further that official action during employment, adversely affecting those vested retirement rights, was within the prescript of section 7 of article Y. Thus it disposed of the second affirmative defense, viz. that the constitutional amendment did not operate to affect contractual rights which came into being under pre-existing statutes. The court pointed out that section 508 of the Education Law (here, Administrative Code of City of New York, § B2013.0) nowhere declares that mortality tables adopted after a person becomes a member shall be used in determining the annuity benefits to which that person is entitled upon retirement. The court saw no reason to read such an intention into the statute. While it indicated a willingness, if need be, to hold that the statute as construed by the defendant was overruled by the Constitution, yet it saw no need to do so, in this dispositive and controlling language (5 N Y 2d 11): “If we are to construe section 508 of the Education Law as authorizing that which the Constitution prohibits, then, the statute must be held to have been superseded by the constitutional amendment. It seems to us that there is no necessity for so holding, since it is reasonable to construe the Education Law as authorizing (1) a periodic review by the State Teachers Retirement System of the mortality tables being used to compute annuities, (2) the adoption of new mortality tables, and (3) the use of the new mortality tables in the computation of the annuities of only such persons as enter the system thereafter.” (Original emphasis.)
Disposing of the argument that the effect of a favorable holding upholding the plaintiff’s claims would plunge the State System into bankruptcy, the majority said (Birnbaum, supra, p. 11): “if the people intended to decree, by the constitutional amendment, that mortality tables adopted by the system after one has become a member are not to be applied in the computation of the annuity of such person, we are not at liberty to hold otherwise simply because the system may become bankrupt as a result.”
The court went on to suggest that it was evident that the people were cognizant of the likelihood of a financial problem by affording to employers an interval between adoption in November, 1938, and the effective date, July 1, 1940, a postponement of a year and a half, an opportunity for employers meanwhile to review and readjust their pension systems (Matter of Bay v. Mruk, 307 N. Y. 349, 354, supra). Yet no action was taken for five and a half years after the effective date until January 9, 1946, and then, as here, it was only by adoption of new tables. *366 The difference here is only in that there was lesser delay, that is, five years from adoption of the amendment in 1938 to July, 1943 when the new tables were adopted, which became effective four years after the effective date of the Constitutional Amendment.
The court faulted the defendant, saying the problem of relief for the State Teachers System was by address to the Legislature, not for the court to ignore the will of the people as expressed in their Constitution.
Remedial legislative action followed at the next session of the Legislature (L. 1959, ch. 141, eff. March 23, 1959). It did three things, directing:
(1) Long-time funding of indicated deficiencies by additional employer contributions,
(2) Transfers as necessary among the funds in the system ; and
(3) Payment of all withheld annuity differences to retired members.
The enactment is impressive here in two respects: First, it demonstrates the part which statutes play in formation of the common law, sometimes pointing the way into other territory when the animating principle is used as a guide (Schuster v. City of New York, 5 N Y 2d 75, 86, majority opinion per Van Voorhis, J.). And the prologue is best quoted in entirety as an expression by the people's representatives of the people's will, a .statement of the public policy: “ Section 1. It is hereby declared to be the policy of the state of New York that it is in the best interests of good government, education and welfare of the state of New York generally that an adequate and proper retirement program be provided for teachers in the public schools of the state of New York to the end that such dedicated public servants may look forward to financial stability at the culmination of years of public service and in order to achieve such desirable results it is necessary, proper and desirable that the New York state teachers’ retirement system be maintained on an actuarially sound basis. A recent decision by the courts of the state of New York has resulted in an order directing the New York state teachers’ retirement system to compute the amount of annuity which will be paid to persons who retire subsequent to August twenty-eighth, nineteen hundred fifty-eight, utilizing mortality tables which were in force at the time such persons joined the teachers' retirement system or July first, nineteen hundred forty, whichever is later, rather than the mortality tables in force at the time such persons retire, resulting, due to the constant increase in longevity, in a situation whereby if such payments are made a deficit in the annuity funds *367 of the New York state teachers’ retirement system will result and such system will thus be actuarially financially unsound, and further if such procedure is to be followed for teachers who retire subsequent to August twenty-eighth, nineteen hundred fifty-eight, as a matter of fairness teachers who have heretofore retired should be afforded the same treatment.”
The case for the petitioners is stronger when the context of the New York City Teachers’ Eetirement Law is considered in the background of its history and in the light of what has been said so far.
The present New York Teachers’ Eetirement System, considered historically and scientifically, has been described as the reorganization in 1917 of its predecessor system as the result of protracted and searching discussion and the greatest possible accommodation, through necessity, of the conflicting interests involved. But it is the fruit also of perhaps the most thorough and painstaking study that has yet been applied to the teachers’ retirement problem in this country (Studensky, Teachers’ Pension Systems in the United States [Appleton & Co., N. Y., 1920] The New York City Fund, pp. 243, 259-260). The story of the evolution of the System following upon the actual bankruptcy of its predecessor together with nine other New York City Eetirement Systems can be had in the various reports of the Mayor’s Commission on Pensions. It is essentially the joint product of this commission and representatives of the teachers (Beport on the Teachers’ Eetirement Fund, City of New York, Commission on Pensions, 1915 [which, interestingly enough, in its forwarding letter dated December 8,1915, contains this sentence (p. 5): “A proper penson plan involves a contractual relation between employer and employees.”] and the report of the Conference Committee on Teachers’ Pensions of the Commission on Pensions and the President of the Board of Education, March 1, 1917).
The notable part of these reports is the insistance on a system of benefits derived from employer and employee contribution— a share-and-share alike method of contributions (Report on Teachers’ Retirement Fund, etc., op. cit. p. 49) — and the fundamental assurance of solvency. Studensky (op. cit.) states:
The cardinal principle of a system operating on the ‘reserve’ basis is that increases in future pension payments are anticipated and-taken care of before they mature. Each teacher is considered a definite obligation against the system from the day he enters the service. A ‘reserve’ fund is established and built up by means of setting aside for each teacher, each year during his service, the necessary amounts properly calculated and usually expressed in terms of percentage of salary. These amounts, which are secured through assessments on salaries or appropriations from public funds, or through combined *368 contributions of the teachers and of the government, are accumulated at interest. When a teacher retires, the ‘ reserve ’ accumulated in this manner on his behalf is adequate to pay his pension for the probable duration of his life after retirement. In the majority of pension systems, teachers forfeit all in the event of death, or part of the claim for a proportionate pension if they leave the service 'before becoming eligible to retirement. If such systems are operated on the ‘reserve’ method, the saving to be derived from such lapses is calculated in advance and utilized for the reduction of the required rates of contribution.
The main advantage of operating a pension system on the ‘reserve’ basis lies in the fact that each generation pays currently its own obligations. A proportionate part of the future pension requirements is set aside each year, and, if calculated properly, the pension scheme under such conditions is solvent at all times. Hardly less important is the fact that a clear understanding of the pension cost is secured by the definite and constant relationship which each year’s contribution to the pension fund bears to the same year’s expenditure for active services. Having been accepted as reasonable by all concerned, the posibility of arbitrary discontinuance or restriction of the scheme and consequent disappointment of prospective beneficiaries is avoided.
Actuarial Determination of Cost. The determination of the probable cost of the benefits obviously involves a computation of the probable mortality and disability of the present and future members of the fund. Such computations can be made accurately only by a trained and experienced actuary. In determining the probable income of the fund, too, actuarial methods may be necessary. It is to the failure of teachers’ pension funds in this country to avail themselves of expert actuarial advice, particularly in connection with the cost of benefits, that the unsound if not insolvent condition now general among them is due.
It is not the purpose of the present volume to discuss the detailed actuarial questions involved in the determination of the costs of the several benefits in question. It will be of value, however, to point out the principal elements and considerations which must be taken into account in computing the major probabilities of the cost of a pension system.
In attempting to determine the probable cost of the 'benefits to be provided, the actuary’s first task is to analyze carefully the personnel records of the service. He must then measure the various forces which bear on the cost of pensions, and express them in terms of rates so that they may be used in calculations. An approximate idea of the magnitude of the actuary’s preliminary work may be formed by examining the following list of rates which he would have to prepare from the experience of the service itself, or adopt from elsewhere in connection with the cost calculations of a typical pension system for teachers:
1. Rate of withdrawal from service because of resignation.
2. Rate of withdrawal from service because of dismissal.
3. Rate of mortality in active service.
4. Rate of salary increases in active service.
5. Rate of retirement because of superannuation.
6. Rate of retirement because of disability.
7. Rate of mortality after retirement because of superannuation.
8. Rate of mortality after retirement because of disability.
Having ascertained these rates, the actuary uses the proper rate ot interest which may be earned on invested accumulations and calculates THE CONTRIBUTIONS TOWARD THE RESERVE WHICH ARB REQUIRED TO SUPPORT THE proposed benefits. Under the ‘reserve’ method the compound interest factor enters to reduce the apparent cost of pensions to more than one-half of the apparent cost under the ‘cash disbursement’ plan. All other conditions *369 being equal, the the same amounts are actually paid out in benefits under both plans. The pension cost, however, is measured under the ‘reserve’ plan by the percentage of the pay-roll needed to be set aside currently to secure future pensions; whereas such cost, under the ‘ cash disbursement ’ plan, is measured by the percentage which the current pension payments form of the annual pay-roll. The first is a constant factor while the second is a changing and steadily increasing factor (pp. 100-103, emphasis in original, caps, supplied).
The first sentence of the last paragraph of the foregoing quotation, as capitalized, describes a practice feasible only at the inception of or during membership. There is no suggestion nor is it conceivable how the practice could affect the allowance upon retirement.
The city of New York and the state of Pennsylvania contribute on a reserve basis with respect to new entrants. The contribution is fixed at such a percentage of salary as is sufficient to provide ‘ pension ’ benefits to all those who according to actural estimates will remain in the service until retirement. The number of those who will withdraw from the service before retirement, through resignation, dismissal or death, is discounted in advance, and no contributions are made on their account. This arrangement considerably reduces the rate of contribution and results in an immediate economy for the government (p. 133).
In Case Tee GOVERNMENT GUARANTEES THE Solvency of the System, it may be Called ebon to Contribute on Account of any Deficiency Which may Appear. Thus, for example, under the system of New York City, the city guarantees that ‘in no case shall such annuity be less for each one hundred dollars of accumulated deductions of a present-teacher at the time of retirement than is shown in the following schedule.’ If the actual rate of mortality among the teachers should be lower than the one assumed, then a deficiency will appear which the city will have to cover. It may be necessary to devise a special contribution which will discharge the deficiency on a reserve basis during a period of years. The problem will be to devise such a form of a ‘deficiency’ contribution as will be most economical under the particular conditions.
Coordinating the Various Elements of the Contribution. The form and rate of each element of the government contribution must be so devised as not only to be most appropriate for meeting the particular liability, but also to harmonize with the other elements of its contribution. The problem is one of coordinating all the component parts in such a way as to make the whole contribution most economical for the government with regard to both its present and future burdens, and also most effective in so far as the solvency of the system is concerned. An illustration of this is afforded by the cases of the new systems of New York City and Pennsylvania. The former was launched with the load of an already existing pension roll which required on its part an immediate annual contribution of a million dollars. Under such abnormal conditions the city could not afford to contribute on a full reserve basis on account of the present active members, and the ‘partial reserve’ was probably more economic. While the annual appropriations for the payment of new pensions will increase, the annual appropriations on account of the old pensions will decrease. The Pennsylvania system started under quite different conditions, for it did not find an already existing pension roll which it had to carry. In view of the absence of this element of contribution it could well afford to contribute on a full reserve basis on account of its present members. *370 Despite the need for precise actuarial computation and for careful fiscal examination which the foregoing discussion shows to be indispensable if the amount of the government’s contribution is to be fixed upon a sound basis, cities and states have resorted to a variety of unscientific and unsound methods. The chief of these are deserving of detailed consideration (pp. 134-135; caps, supplied).
Upon a consideration of various parts of the New York City Teachers’ Retirement Law so as to get a picture of its method of operation, it is seen that a teacher as a member (§ B20-3.0) of the Retirement System, an arrangement for the payment of retirement allowances (§ B20-1.0, subd. 1), is a “ contributor ” (§ B20-1.0, subd. 10) and upon retirement, among other contingencies, becomes a “ beneficiary ” (§ B20-1.0, subd. 12). The retirement allowance (§ B20-1.0, subd. 25) consists of “pension”, meaning payments for life derived from appropriations made by the city, etc. (§ B20-1.0, subd. 23) , and “annuity” which means payments for life derived from contributions made by a contributor (§ B20-1.0, subd. 24) . Rates of contribution for new entrants, the city’s and the contributor’s, are established on the basis of certification of tables by the respondent after actuarial investigation every five years into mortality and service experience of the contributors and beneficiaries (§ B20-13.0). The contributor’s portion for his annuity in the form of payroll deductions at a constant rate is accumulated in the Annuity Savings Fund. The rate or such percentage is based on mortality tables, etc. to procure an annuity upon retirement of 25% of his average salary (§ B20-20.0). Upon retirement his accumulated deductions shall be transferred from the Annuity Savings Fund to the Annuity Reserve Fund out of which his annuity shall be paid (§ B20-21.0).
The city’s contribution for the pension portion of the retirement allowance at a rate established for a new entrant based upon mortality tables shall be paid monthly by the city during the employment into.the Contingent Reserve Fund (§ B20-26.0). Upon the teacher’s retirement an amount equal to his reserve sTifl.1I be transferred into Pension Reserve Fund Number One from which the pension portion of the retirement allowance shall be paid. Upon retirement, after prescribed service or for age, in addition to the pension of 25% of his average salary ,(§ B20-44.0, subd. 1, par. 6), he shall have “An annuity * * * which shall be the actuarial equivalent of his accumulated deductions at the time of his retirement.” (§ B20-44.0, subd. 2.)
Distinguishably, the New York City Teachers’ Retirement System includes the broad guarantee and obligating provision *371 (§ B20-30.0) which is altogether lacking in the New York State Teachers Retirement System (Birnbaum, supra). Similar, if not identical, provisions are to be found in the following systems, in the respective indicated sections:
New York State Employees’ Retirement System (Retirement and Social Security Law, § 18).
New York City Board of Education Employees’ Retirement System (Rules and Regulations of Board of Education Retirement System [administered according to Education Law], § 2575, § 9).
New York City Employees’ Retirement System (Administrative Code of City of New York, § B3-21.0).
New York City Police Pension Fund (Administrative Code of City of New York, § B18-27.0).
New York Fire Department Pension Fund (Administrative Code of City of New York, § B 19-7.25).
Hunter College Retirement System (Administrative Code of City of New York, § G41-34.0).
Health Department Pension Fund (Administrative Code of City of New York, § G41-61.0).
This provision evidently came into being following the experiences of insolvency and after investigation in 1915 and 1916 “ the city asserted that since the passage of the proposed law was requested by the city (thus differing from the old-law which was enacted at the request of the teachers), and since it would voluntarily assume the financial obligations involved in it ’ ’. (Studensky, Teachers’ Pension Systems in the United States [Appleton & Co., N. Y., 1920], supra, p. 256.)
The heading “ Guarantee of funds ” which was inserted by the Legislature is considered when looking for the meaning and effect of the law, as part of the whole section (McKinney’s Cons. Laws of N. Y., Book 1, Statutes, § 130). Section B20-30.0 analyzed makes it the obligation of the city (1) to create and maintain reserves in the Contingent Reserve Fund (the depositary of the city’s contributions during employment toward the 25% pension part of the retirement allowance) and (2) to maintain annuity reserves (from whence is paid the annuity portion of the retirement allowance derived by the member’s contributions during employment) and pension reserves (the depositary into which is transferred from the Contingent Reserve Fund, the city’s contributions for the 25% pension part of the retirement allowances) and (3) to pay all benefits under this law. In the plain language of the last three sentences of the section the duty is put on the respondent (4) on the basis of each actuarial determination and appraisal (B20-13.0) to *372 secure from the City of New York by annual budgetary appropriation funds necessary to complete the payment of obligations accruing during the ensuing fiscal year. (5) The city, through its Board of Estimate, in unequivocal terms, is mandated to include annually in its budget a sum sufficient to provide for such obligations of the city. (6) The city’s fiscal officer, the Comptroller, is mandated to pay the sums so provided into the various funds provided for in the New York City Teachers’ Retirement Law.
There is no issue here about the pension portion. Although nothing is said about it, presumably the rate of contribution by the city, fixed upon entering service and maintained throughout, if found aetuarially insufficient during employment, is adjusted and paid by the city annually by budgetary appropriation in accordance with the last three sentences of section B20-30.0. That is the requirement, but whether or not it is observed, it is the requirement, applicable also to the annuity reserve fund. If the respondent, in its actuarial investigation, has overlooked the contingency of increased life expectancies as a factor when fixing rates of contributions for new entrants for their future annuities, then the fault may not be laid on the petitioners. And if there be a deficiency in any of the funds, the obligation is the city’s, to be appropriated by it on the respondent’s request. Practically, it may all be merely hypothetical, nevertheless, even if proven real, accepting the respondent’s figure of $36,800,000 as the unforeseen liability, there is still available nearly, if not, $900,000,000 in assets in the System. But, as was said in Birnbaum (supra) the argument is irrelevant. Relief, if required, is by address to the Legislature, not within the judicial competence.
The disposition of the remaining defenses is controlled by many precedents.
In the absence of express provision in law, acceptance of a lesser amount by the beneficiaries, without protest, does not bar relief upon any principle of waiver, estoppel or accord and satisfaction (Quayle v. City of New York, 278 N. Y. 19, 22; Clark v. State of New York, 142 N. Y. 101, 105-106). Delay, in part attributable to the respondent, will not, without a showing of prejudice or damage, support the equitable defense of laches. Nor is the defense available where the relief sought is a matter of right rather than indulgence (Harman v. Board of Educ. of City of N. Y., 196 Misc. 287, 296, affd. 275 App. Div. 694, affd. 300 N. Y. 21; People ex rel. Gas Light Co. v. Common Council, 78 N. Y. 56, 63).
*373 The relief which is sought in these proceedings charges the violation of a continuing duty imposed by the Constitution is properly invoked and is unaffected by the four months’ time limitation of section 1286 of the Civil Practice Act.
11 Argument against the petition on the score of untimeliness is of no avail. For the petition charges a continuing failure of the respondents to obey the command of * * # the State Constitution ”. (Matter of Cash v. Bates, 301 N. Y. 258, 261.)
“ While it is true that the petition in this case refers to action taken in the past and attacks it as arbitrary, and that is where the emphasis lies, nevertheless, it also attacks such action as illegal for failure to comply with mandated procedural requirements. To that extent it seeks the performance of a duty which petitioner claims is imposed by law on the municipal civil service commission and seeks a direction that the municipal civil service commission make new classifications of positions and new allocations of salary schedules to comply with mandated procedure. This is the classic situation in which the courts have held that the limitation is computed from the time of refusal after demand to perform the duty. (Matter of Beggs v. Kern, 172 Misc. 556, affd. 258 App. Div. 1049, mod. on other grounds 284 N. Y. 504, supra, Matter of Powers v. La Guardia, 292 N. Y. 695, supra, cf. Toscano v; McGoldrick, 300 N. Y. 156, supra * * * ) ”. (Breitel, J., in Matter of Foy v. Brewnan, 285 App. Div. 669, 673-674.)
The relationship between the parties is a fiduciary one. By law the individual members of the board are trustees of the several funds of the System (§ B20-31.0). As such trustees of both the Annuity Savings Fund (the member’9 contributions during his employment) ultimately the source of the reserve in the Annuity Reserve Fund (from which the annuity as part of the retirement allowance will be paid), it is a depositor-depositary relationship.
The six-year limitation of section 48 of the Civil Practice Act did not commence to run until the demand (Matter of Furgueson v. La Guardia, 171 Misc. 270, 273, affd. 257 App. Div. 1048, affd. 281 N. Y. 678).
Actuarial values including currently effective tables of mortality used to fix the rate of contribution for the annuity (as part of the future retirement allowance) upon entering service must be the determinants when calculating the annuity upon retirement as the actuarial equivalent of the member’s contributions, plus interest. The contrary practice of the respondent of employing tables adopted subsequent to fixation of the rate of *374 contribution upon entering service is invalid and violative of the prohibition against impairment or reduction of contractual benefits in the Retirement System, according to section 7 of article Y of the New York State Constitution. The utilization by the respondent of experience tables of mortality and other information developed in the course of actuarial investigations mandated by section B20-13.0 of the Administrative Code of the City of New York, may validly be applied only as to new members of the New York Teachers’ Retirement System when fixing their rates of contribution for their annuities and may not be applied retroactively to persons already in service whose rates of contribution were fixed at the time of employment according to tables then in effect. The beneficiaries who have been affected by the invalid practice of the respondent, which is violative of its duty enjoined by law, by receiving their annuities in reduced amounts have suffered a loss of their own moneys and, in good conscience and as a matter of public policy as expressed by the people in their Constitution and Legislature, are entitled to reimbursement.
Settle order.